# EXHIBIT 1

**DAVID O. BLACK #0346**
BLACK & ARGYLE, P.C.
Williamsburg Office Park
5806 South 900 East
Salt Lake City, Utah 84121
Telephone: (801) 484-3017
Facsimile: (801) 892-0116



*Attorney for Plaintiff*

---

## THIRD JUDICIAL DISTRICT COURT IN AND FOR SALT LAKE COUNTY, WEST JORDAN DEPARTMENT, STATE OF UTAH

---

| | |
|---|---|
| IP Telesis, a Nevada Corporation | **COMPLAINT** |
| Plaintiff, | |
| vs. | **(JURY DEMAND)** |
| Martin Toha | Case No. 09041 5502 |
| | Judge: Adkins |
| Defendant. | |

---

Plaintiff alleges and complains of Defendant as follows:

### PARTIES

1.      Plaintiff IP Telesis Inc., (hereinafter "IP Telesis") is a privately held Nevada Corporation doing business in Utah with its principle place of business at 4548 South Atherton Drive, Salt Lake City, Utah, Salt Lake County.

2.      Defendant Martin Toha (hereinafter "Toha") is a resident of the state of Florida and from November 19, 2007 until March 23, 2009 has been a member of the Board of Directors of IP Telesis.

3.      This Court has subject matter jurisdiction over the claims asserted in this complain Complaint and the acts of Toha complained of herein relate to or arise from the transaction of business by Toha in the State of Utah and the acts of Toha complained of herein have caused injury to IP Telesis whose principle place of business is in Salt Lake County, State of Utah and this Court personal jurisdiction over Defendant Toha under the provisions of § 78-27-24 Utah Code Annotated and venue is properly laid in the Salt Lake County Division of the Third Judicial District.

## FACTS

4.      IP Telesis was organized in December of 2004 and since its organization IP Telesis has been engaged in the business of providing voice over the Internet telecommunications services (commonly known as "VoIP telecommunications services") on a retail basis to business and residential end users in the United States.

5.      Since it formation in December of 2004 Plaintiff IP Telesis has also been engaged in the business of providing VoIP services on a wholesale basis to other VoIP service providers throughout the United States.

6.      IP Telesis developed its own propitiatory and confidential methods of doing business, pricing structures, customer lists and unique software to operate it business.

7. IP Telesis in operating its business has also developed customer lists, pricing structures, business plans and financial records which are confidential, proprietary information, trade secrets and protected property of IP Telesis not in the public domain.

8. IP Retail Inc., is a Florida for Profit Corporation organized in October, 2005.

9. IP Retail does business under the name VOIP.com and is the owner of the Internet domain name voip.com and markets it's VoIP telecommunications services under the name Voip.com through its Voip.com website (voip.com). (IP Retail shall hereinafter be referred to as "Voip.com").

10. Voip.com is also engaged in the business of providing VoIP telecommunications services to business and residential end users and to other VoIP telecommunications providers on a wholesale basis.

11. Voip.com's voice over the Internet service uses proprietary software developed by its related or affiliated company, Rapid Portal Systems, Inc., (hereinafter "Rapid Portal").

12. Rapid Portal, Inc., also customizes Voip.com's Administration Software Platform for Voip.com's wholesale customers by providing additional software, including private label hosting and branding services, to be offered by its whole sale customers to their customers.

13. Voip.com and Rapid Portal were founded by Defendant Martin Toha (hereinafter "Toha").

14. Since their organization founder Toha has served as the President and has been a Director of both Voip.com and Rapid Portal and is the controlling shareholder of both companies and Toha supervises and controls the activities, the actions and business decisions of Voip.com and Rapid Portal.

15.     Starting in 2005, IP Telesis entered into a business relationship with Voip.com and IP Telesis began working with Toha, Voip.com and Rapid Portal to share information to assist Toha, Voip.com and Rapid Portal with various projects to further developing VoIP back end software and private label services that Voip.com offers to its retail and wholesale customers

16.     Voip.com's business plan was focused primarily on the marketing VoIP telecommunication services to residential and business end users.

17.     IP Telesis business plan was primarily focused on marketing VoIP telecommunication service on a wholesale base to other Voip communication providers.

18.     In early 2007 due to the favorable business relationship that had developed between IP Telesis and Voip.com and the financial synergies between the two companies negotiations for an acquisition of Voip.com by IP Telesis or a merger of the two companies and sale of the combined companies to a third party commenced.

19.     In late 2007 after negotiating the basic terms of the acquisition or merger of Voip.com and Telesis, it was agreed to by Toha, Voip.com and IP Telesis that IP Telesis would seek out and identify third parties to fund the an acquisition of assets of Voip.com, or to buy the combined companies upon a merger. In connection therewith, Brian Pettersen was to act as IP Telesis' exclusive agent.

20.     In furtherance of the joint business plan for acquisition or merger and sale of the combined companies, IP Telesis and Voip.com entered into joint Operating Agreement in September of 2007.

21. Under terms of the joint Operating Agreement, Voip.com agreed to give the exclusive right to all customer leads for any five line plus customers that it obtained to IP Telesis to be sold or marketed under a revenue sharing agreement with Voip.com under the branded label of IP Telesis and IP Telesis would agree to give Voip.com its residential customers under a revenues sharing agreement to be marketed under the branded label of Voip.com.

22. To further integrate their operations and to facilitate IP Telesis and Voip.com's joint business plan for the acquisition of Voip.com by IP Telesis or a merger of the two companies and a sale of the combined companies, Toha was appointed to the Board of Directors of IP Telesis on October 20, 2007.

23. In early 2008, Voip.com and IP Telesis jointly prepared a confidential written Business Plan to present to financial partners to fund the acquisition of Voip.com by IP Telesis and/or to present to third parties interested in acquiring the combined companies.

24. To further integrate IP Telesis operations, and as part of the joint Business plan agreement between Voip.com and IP Telesis to sell the combined companies on March 8, 2008, IP Telesis and Rapid Portal entered into a Software and Code License Agreement with Rapid Portal, Inc., for the license of a duplicate of Voip.com's Software Administration Panel and for joint customization of the installation of this software to IP Telesis specifications.

25. This Software Code License Agreement also provided for the customization of a voice mail software platform for a large wholesale customer of IP Telesis, Touchpon International.

26. Sometime in July of 2008, one of IP Telesis wholesale customers Elevate Communication LLC, a Salt Lake City based Utah LLC (hereinafter "Elevate"), informed IP

Page 5 of 22

Telesis that it wanted to expand its voice over the internet business and was interested in entering into negotiations with IP Telesis with a view toward developing further business relations with IP Telesis, including the possible acquisition of IP Telesis .

27.     Shortly after being contact by Elevate, IP Telesis informed Toha that it had identified a serious contact (Elevate) for the acquisition of the combined IP Telesis and Voip.com companies and Toha approved and encouraged IP Telesis to engage in discussion with Elevate for the purpose of Elevate buying the combined companies in accordance with the parties joint business plan.

28.     On or around September 30, 208, with the knowledge and encouragement of Toha, IP Telesis and Voip.com jointly prepared a confidential Business Plan and Term sheet which was provided to Elevate.

29.     Some time before October 30, 2008, Elevate contacted IP Telesis and expressed interest in investing in IP Telesis.  At this meeting, Elevate requested more detailed information about IP Telesis and Voip.com.

30.     To facilitate the exchange of confidential information in furtherance of the negotiations between IP Telesis and Elevate, IP Telesis and Elevate entered into a Mutual Non Disclosure Agreement on October 30, 2008. ("NDA").  (A copy of NDA of October 30, 2008, is attached hereto as Exhibit "A").

31.     The NDA of October 30, 2008, expressly provides that any exchange of confidential information between IP Telesis and Elevate disclosed is to be used solely for the purpose of the parties evaluating the information in connection with discussions of a possible

business relationship between the IP Telesis and Elevate, and that the obligations, including Authorized Use restrictions under the NDA, survive the termination of any discussions and extend for a period of two years from the effective date of the NDA (until October 30, 2010) unless such disclosure would involve trade secrets, in which case the obligations found in the NDA would extend indefinitely.

32.     Subject to the terms, conditions and restrictions on use found in the NDA of October 30, 2008, IP Telesis provided confidential information to Elevate including, but not limited to, confidential information concerning it's financial condition, it banking records, it's customer lists, customer contracts, customer pricing, IP Telesis methods and procedures for doing business and detailed information concerning it's proprietary software.

33.     Also at that time and under the terms, conditions and the restrictions on use found in the NDA of October 30, 2008, IP Telesis disclosed to Elevate confidential information concerning it's business relationship with Voip.com, Inc., and Rapid Portal, including the terms of its license agreement with Rapid Portal and it's agreement for the joint development by IP Telesis and Rapid Portal of a customized Voip.com based voice mail software platform for an IP Telesis key customer, TouchFon International.

34.     Also at this time, and subject to the terms, conditions and restrictions on use found in the NDA of October 30, 2008, IP Telesis, with Toha's knowledge, approval and encouragement, provided confidential information of the IP Telesis and Voip.com agreement and joint Business Plan for the acquisition of Voip.com by IP Telesis or a merger of the two companies and sale of the combined companies to a third party.

35.     At this time, IP Telesis provided Elevate with a copy of IP Telesis and Voip.com's confidential joint Business Plan.

36.     On December 18, 2008, Elevate prepared and presented to IP Telesis for its acceptance, a formal 30 day letter of intent ("LOI") to purchase IP Telesis, setting forth the terms of Elevate's proposed acquisition (attached hereto as Exhibit "B").

37.     Elevate Communication' s LOI of December 18, 2008, was reviewed by each member of IP Telesis's Board of Directors, including Martin Toha. By unanimous consent, the Board of Directors of IP Telesis authorized either the President or Chairman of IP Telesis to accept and execute the LOI on December 19, 2008.

38.     On December 19, 2008, IP Telesis executed the December 18, 2008, LOI and delivered an executed copy of the LOI to Elevate.

39.     Under the terms of the LOI of December 18, 2008, the LOI would expire 30 days after its acceptance by IP Telesis (January 19, 2009) and during the 30 day period following IP Telesis's acceptance, only Elevate (the "purchaser") could terminate the LOI .

40.     The December 18, 2008, LOI expressly provided that the provisions of paragraphs 7, 8, 9, 11,12, 13,14, and 15 of the LOI would be binding provisions during the 30 day negotiation period and that the provisions of paragraphs 7(b), 7(c), 7(d) 11, 12, and 14 would survive the termination or expiration of the LOI.

41.     Paragraph 12 of the LOI of December 19, 2008 between IP Telesis and Elevate is as follows:

> 12. Confidentiality. Each of the Company [IP Telesis] and the Purchaser [Elevate] agree that each of them shall at all times

Page 8 of 22

take all reasonably necessary steps to safeguard the confidentiality of proprietary information of the other party disclosed by or on behalf of that party in connection with the Acquisition, that such information will be used solely of the purpose of evaluating the Acquisition, and that such information will not be disclosed to any third party without the prior written consent of the other party; provided, however, that the Company and the Purchaser may disclose:

> (a)   Information which at the time of the disclosure is part of the public knowledge and easily accessible to such third party; and

> (b)   Information that is required by law to be disclosed. The Company and the purchaser further agree that if the Acquisition is not consummated, each of them will return to the other party any and all material containing or reflecting such information.

> The company and the Purchaser further agree that if the Acquisition is not consummated, each of them will return to the other party any and all material containing or reflecting such information.

> The Company understands and agrees that the Purchaser will be negotiating regarding the acquisition of Voip.com concurrently with its undertaking to complete the Purchase Agreement and Closing. Subject to any limitations contained in this Section 12, any relationship Purchaser has previously acquired or will acquire with respect to Voip.com and any relationship or agreement the Company may have with Voip.com may be used by the Purchaser during the term hereof solely in connection with the Purchaser's negotiations with Voip.com.

> The Purchaser acknowledges that the Company has a preexisting business relationship with Voip.com. The parties hereto acknowledge and agree that any existing agreement between the Company and Voip.com shall be included in the Assets to be transferred to the Purchaser upon Closing and that during the term hereof the Company shall cease any

and all negotiations regarding the acquisition of Voip.com. The Purchaser shall not close or complete any agreement with Voip.com until the closing of the Purchase Agreement, except for a non-binding letter of intent to acquire Voip,.com. If for any reason the Purchase Agreement does not close, the Purchaser agrees that it shall terminate any negotiations, agreements or arrangements to acquire an ownership interest in Voip.com and so long as the Company is in active negotiations with or has a contract with Voip.com to acquire an ownership interest in Voip.com, the Purchaser shall not initiate negotiations to enter into an agreement or arrangement with Voip.com to acquire an ownership interest in Voip.com for a period of one year thereafter, without the prior written consent of the Company.

42. After December 19, 2008, Elevate, in accordance with and subject to the terms of NDA of October 30, 2008, and LOI of December 19, 2008, continued to negotiate with IP Telesis to finalize details of the acquisition of IP Telesis by Elevate.

43 Also after December 19, 2008, in accordance with and subject to the terms of the LOI of December 19, 2008, and in accordance with IP Telesis agreement and joint business plan to sell the combine IP Telesis and Viop.com companies, Elevate, as the proposed purchaser of IP Telesis assets, continued to negotiate for the acquisition of assets of Viop.com, and continued to receive confidential information about Voip.com, Inc., from both IP Telesis and Voip.com subject to the terms, conditions and restriction on use found in both the LOI of December 18, 2008, and the NDA of October 30, 2008.

44. At the request of Elevate Communications, on January 16, 2009, IP Telesis and Elevate Communication entered into a letter agreement extending the expiration date of LOI of

December 19, 2008, from 30 days (until January 18, 2009) to 45 days (until Monday, February 2, 2009).

45.    Elevate informed IP Telesis that the reason for the extension the expiration of the LOI of December 19, 2998 was that Elevate required additional time to reach a preliminary agreement with Viop.com and conclude letter of intent to purchase assets of Voip.com as contemplated under the LOI with IP Telesis of December 18, 2008 and the IP Telesis's and Voip.com's agreement and joint business plan to sell the combined companies.

46.    After December 18, 2008, and up to January 29, 2008, Toha, IP Telesis and its officers and directors worked jointly together to negotiate with Elevate the terms and conditions of the a sale of the assets of both Voip.com and IP Telesis and continued to provide confidential information about both Voip.com and IP Telesis to Elevate subject to the NDA of October 30, 2008 and the LOI of December 18, 2008 and the parties joint confidential Business Plan

47.    At all times material hereto, Toha understood and agreed that that Elevate was a contact and potential buyer identified by IP Telesis and was brought to Toha and Voip.com as part of Voip.com and IP Telesis's agreement, joint venture arrangement and confidential Business Plan to sell the combined companies to a third party buyer.

48.    At all material times hereto, Toha, Voip.com and Rapid Portal knew and agreed that confidential information exchanged amongst IP Telesis, Toha, Voip.com and Rapid Portal disclosed and provided to Elevate, including but not limited to. Voip.com's and IP confidential Business Plan, their respective financial, customer lists, customer contracts, pricing schedules, customized software platforms and joint performa financial projections of the combined

companies, was subject to the terms, conditions and restriction of use found in the NDA of October, 30, 2008 and the LOI of December 18, 2008 and was disclosed and provided to Elevate solely for the purpose of negotiating a sale of the assets of both IP Telesis and Voip.com.

49.     On January 28, 2009, Elevate presented to Toha a 60-day letter of intent to purchase Voip.com, Inc., to be accepted by Voip.com no later than 5:00 p.m. on January 29, 2009. The January 28, 2009 letter contemplated the purchase of all of the assets of Voip.com through a definitive agreement to be closed within 60 days of Voip.com's acceptance of Elevates LOI of January 28, 2009.

50.     The LOI dated January 28, 2009, between Elevate and Voip.com required Voip.com to terminate and cease any negotiations with any third party and not to enter into negotiations with any third party for the sale of all or part of its assets during the 60 day period allowed under the LOI for Elevate and Voip.com, Inc., to enter into and close a definitive acquisition agreement.

51.     Toha as President of Voip.com, accepted Elevate's LOI of January 28, 2009 for the purchase of the assets of Voip.com on Thursday January 29, 2009.

52.     On the afternoon of Thursday, January 29, 2009, Phil Berry of Elevate called IP Telesis Director Brian Petterson and IP Telesis President Greg Nielsen and informed Petterson and Nielsen that Elevate was terminating the LOI of December 18, 2008 and would not be moving forward with the purchase of the assets of IP Telesis.

53.     On or around January 30, 2009, Elevate sent to IP Telesis by email and by hand delivery an undated letter terminating the LOI of December 18 as extended by the Letter agreement of January 16, 2009.

54.     On the January 29, 2009, shortly after the telephone call from Phil Berry notifying IP Telesis that Elevate was terminating the LOI of December 18, 2008 as set forth above, Greg Nielsen, President of IP Telesis, sent an email to Phil Berry, Kim Rimmasch (Vice President of Elevate Communications), and Wright Thurston (President of Elevate Communications), informing Elevate that IP Telesis had contacted Toha and intended to immediately recommence active negotiations to acquire an ownership interest or merge with Voip.com, Inc., and demanded that Elevate terminate any negotiation, arrangement or agreement to acquire Voip.com as required under the provisions of Paragraph 12 of LOI of December 18, 2008, further demanding that Elevate return all original copies of information that had been furnished to them and destroy all copies as required under the terms of Mutual Non Disclosure Agreement of October 30, 2008.

55.     Subsequent to the termination of the LOI of December 19, 2008 for the purchase of IP Telesis, Phil Berry of Elevate in emails and in telephone conversations, informed Greg Nielsen (President of IP Telesis) that Elevate intended to move forward with the purchase of the assets of Voip.com notwithstanding the fact that Elevate had terminated the LOI of December 18, 2009.

56.     In telephone conversations with Nielsen subsequent to Elevate's terminatino of it's LOI to purchase the assets of IP Telesis, Berry specifically proposed to Nielsen that his best

option at this point would be to consider selling off the assets of IP Telesis to a third party, retain the TouchFon Software Development Agreement, and bring that agreement to Elevate because Nielsen would have to deal with Elevate in the future for the development of that software after Elevate closed the purchase of assets of Voip.com.

57.     In conversations with Berry subsequent to Elevate's termination of its LOI to purchase the assets of IP Telesis, Berry specifically stated to Nielsen that having reviewed IP Telesis's financials, Elevate was in a position to, and was prepared to, outspend IP Telesis on legal fees if IP Telesis tried to prevent Elevate from closing its purchase of assets of Voip.com.

58.     In conversations with Nielsen after Elevate terminated it's LOI to purchase the assets of IP Telesis, both Berry and the President of Elevate (Wright Thurston), told Nielsen that with the planned acquisition of assets of Voip.com, Elevate had started recruiting its management team and would need "good people" that "have Nielsen's demonstrated expertise in developing and marketing VoIP telecommunications software and service" and that Elevate would be willing to offer Nielsen a key executive position with Elevate with an annual salary of between $200,000 and $250,000.00.

59.     Since Elevate terminated its LOI of December 18, 2008, Toha has continued to actively negotiate with Elevate for its acquisition of the assets of Voip.com only.

60.     Since Elevate terminated its LOI of December 18 with IP Telesis, Toha has continued to disclose additional confidential information about IP Telesis including IP Telesis's business methods, business, software, customer agreements, and customer pricing.

61.     If Elevate and Voip.com go forward and conclude the purchase of the assets of Voip.com independent of the purchase of the assets of IP Telesis,IP Telesis will lose a valuable corporate opportunity to purchase the assets of Voip.com and or merge with Voip.com to sell the asset of the combined companies that IP Telesis and Voip.com have been jointly developing since 2007, and IP Telesis will suffer significant, substantial, irreparable harm that is difficult, if not impossible, to quantify or calculate.

62.     If Elevate and Voip.com go forward and conclude the sale of the of the assets of Voip.com to Elevate, independent of the purchase by Elevate of the assets of IP Telesis, Elevate will be in a position to use  the confidential information disclosed to Elevate by IP Telesis, Toha and Voip..com, including but not limited to, details of IP Telesis and Voip.com jointly developed customized software platform, IP Telesis method of doing business, IP Telesis financial and banking records, IP Telesis's customer lists and customer agreements, IP Telesis pricing schedules, the details of IP Telesis's ongoing software development projects, to it competitive advantage and IP Telesis will suffer substantial and irreparable harm that is difficult, if not impossible, to quantify and calculate.

63.     On March 12, 2009, IP Telesis filed an action in the Third District Court for Salt Lake County against Elevate Communication and certain of it officers and managers ( *IP Telesis v. Elevate Communications, LCC et. al.*,  case # 090403534) claiming that Elevate Communication, LLC's continued attempts to negotiate and conclude acquisition of Voip.com after canceling the LOI to purchase IP.Telesis (1) constitutes a breach of the NDA of Oct 30, 2008, and the binding provisions of LOI of October 20, 2009, between IP Telesis and Elevate (2) constitutes a breach of the duties of good faith and fair dealing Elevate owes IP Telesis (3)

constitutes a wrongful and intentional interference with a key business relationship of IP Telesis and (4) constitutes wrongful and intentional attempt to misappropriate or convert a business opportunity of IP Telesis to Elevate for it's own benefit to the exclusion of IP Telesis.

64.    The Complaint in the *IP Telesis v Elevate, et. al.*, action alleges that IP Telesis will suffer irreparable harm if Elevate concludes it's planned acquisition of Voip.com and seeks injunctive relief enjoining Elevate from going forward with it's intended purchase of the assets of Voip.com.

65.    July 6, 2009 At the same time IP Telesis filed the Complaint against Elevate, it filed a Motion for Preliminary Injunction and Request for *Expedited Hearing requesting that* Elevate be preliminary enjoined from going forward with its planned acquisition of Voip.com and requesting an expedited hearing. This Motion for Preliminary Injunction and Request for Expedited Hearing is pending.

66.    Upon receiving notice of and a copy of the IP Telesis Complaint and Motion for Preliminary Injunction in the *IP Telesis v Elevate, et. al.* matter, Toha voice messaged Greg Nielsen, President of IP Telesis, and told him that he intended to go forward with the finalization of sale of the assets Voip.com to Elevate notwithstanding the fact that Elevate was not going forward with the purchase of assets of IP Telesis and further informed Nielsen that if he did not get hold of his lawyers and withdraw the lawsuit that he would see that Voip.com retaliated against IP Telesis by terminating on going joint software development projects, terminate IP Telesis right to buy the Voip.com domain name and Voip.com 1-800 telephone number, call due certain monies owed by IP Telesis to Rapid Portal due so Elevate could foreclose IP Telesis's interest out in certain ongoing joint software development projects between IP Telesis upon the

sale of Voip.com's assets to Elevate and that Rapid Portal, Inc., and Voip.com, could and otherwise hurt IP Telesis in it's ongoing business in the event it tried to stop the acquisition of Voip.com by Elevate.

67.     Further, in the exchange of voice messages between Toha and Nielsen, Toha told Nielsen that until he got his lawyers to withdraw the lawsuit against Elevate, he was going to shut down or take off line the customized voice mail feature jointly developed by IP Telesis and Rapid Portal for IP Telesis's key customer, Touchpon International, and during the course of the exchange of this voice mail conversation, did in fact shut down the customized Touchpon voice mail feature causing damage to IP Telesis's relationship with it's key customer, TouchFon International.  The Defendant's action caused 800 customer accounts to be taken offline.

68.     Based upon the emails and the telephone conversations with the officers of Elevate subsequent to January 29, 2009, and voice message conversations with Toha, IP Telesis believes that Elevate and Voip.com intend and are moving forward to finalize a definitive purchase agreement for all or substantially all of the assets of Voip.com in accordance with the terms found in the January 28, 2009, LOI between Elevate and Voip.com.

## CLAIMS

## CAUSE OF ACTION I

# BREACH OF A DIRECTOR'S FIDUCIARY DUTY OWED TO A CORPORATION AND ITS SHAREHOLDERS AND USURPATION OF CORPORATE OPPORTUNITY

69.     Plaintiff re-alleges, as if set forth herein in their entirety, the allegations of paragraphs 1-68 above.

70.     The conduct of Toha in going forward with the finalization of the sale of the assets of Voip.com to Elevate Communication after Elevate terminated the LOI of December 18, 2008 constitutes a knowing intentional or reckless attempt to usurp an opportunity found and developed by IP Telesis for his own personal gain to the exclusion of IP Telesis and is a breach of the fiduciary duties Toha owes to IP Telesis and its shareholders as a Director of IP Telesis.

71.     The conduct of Toha in threatening business retaliation against IP Telesis unless it cooperates in allowing Elevate to go forward with acquisition of the assets of Voip.com after termination of Elevates LOI of December 18, for the purchase of the assets of IP Telesis is an intentional, knowing or reckless breach of the duties owed by Toha as a Director of IP Telesis to IP Telesis and its shareholders.

72.     Because the Defendant's actions were intentional or reckless and calculated to cause harm, Plaintiff should be awarded punitive damages against the Defendant in an amount not less than $5,000,000.00.

## CAUSE OF ACTION II

## BREACH JOINT VENTURE AGREEMENT AND BREACH OF DUTIES OF GOOD FAITH AND FAIR DEALING

73.     Plaintiff re-alleges, as if set forth herein in their entirety, the allegations of paragraphs 1-72 above.

74.     Before any contact from Elevate about the possible acquisition of IP Telesis Voip. Com and had entered into a joint business plan, an joint venture agreement and for the acquistion of or merger of the combined assets of both IP Telesis and Voip.com and both IP

Telesis and Voip.com undertook significant actions and entered in to various agreement to facilitate this joint business plan and joint venture agreement

75.     Elevate was brought to Voip.com by IP Telesis under the parties joint business plan and joint venture agreement to find a buyer for combined assets of both companies

76.     All negotiations with Elevate and disclosure of confidential information was made to Elevate by both IP Telesis Voip.com and Toha pursuant to the parties joint business and joint venture agreement to find a buyer for the combined companies and under the terms of confidentiality agreements limiting the use of such information solely for that purpose.

77.     The conduct of Toha in going forward with the finalization of the sale of the assets of Voip.com to Elevate Communication after Elevate terminated the LOI of December 18, 2008 constitutes a knowing intention or reckless breach of the joint venture business plan between IP Telesis and Voip.com and is a knowing and intentional breach of the duties of good faith and fair dealing that Toha, Voip.com and Rapid Portal owe to IP Telesis that arise from their relationship as joint venture partners and implied duties of good faith and fair dealing that arise for their joint venture agreement, and their joint business plan for the sale of the combined assets of both companies to third party buyer.

78.     The conduct of Toha, as the President and a Director of Voip.com and Rapid portal in threatening business retaliation by against IP Telesis unless it cooperates in allowing Elevate to go forward with acquisition of the assets of Voip.com after termination of Elevates LOI of December 18, for the purchase of the assets of IP Telesis is s a knowing and intentional breach of the duties of good faith and fair dealing that Toha, Voip.com and Rapid Portal owe to

IP Telesis that arise from their joint venture agreement, and joint business plan and for the sale of the combined assets of both companies to third party buyer and the contracts and agreement between t IP Telesis, Voip.com and Rapid Portal entered into  furtherance of the parties this joint venture agreement and business plan.

## CAUSE OF ACTION IV

## INTENTIONAL INTERFERENCE WITH BUSINESS AND ECONOMIC INTERFERENCE

79.   Plaintiff re-alleges, as if set forth herein in their entirety, the allegations of paragraphs 1-78 above

80.   The conduct of Toha as alleged here in constitutes intentional, knowing or reckless interference of IP Telesis business and its relationship with  it customers, including IP Telesis whole customers Elevate Communications LCC and Touchpon International .

## PRAYER FOR RELIEF

A.   That the Court enter a Preliminary Injunction on an expedited basis to be enforce during the pendency of this action enjoining Toha from directly or indirectly through third parties, nominees or agent entering into any agreement for the purchase of all or part of the assets of either Voip.com or Rapid Portal, Inc., and order that Toha terminate further negotiations with Voip.com for the purchase of any or all of the assets of Voip.com and enjoin Toha from taking action to finalize the LOI of January 28, 2008 between Elevate and Voip.com; and

B.   Upon trial of this matter or upon evidentiary hearing, for a final judgment granting permanent injunctive relief enjoining Toha from entering into or finalizing any existing agreement for the purchase of Voip.com or any or all of it asset and enjoining the Toha, directly or indirect through third parties, nominees or agents, from entering into negotiations with Elevate for the purpose of the purchase of Voip.com or any or all of it's assets until after October 30, 2010 in accordance with the terms, conditions, obligations and restrictions found in the NDA of October 30, 2008 between Elevate and IP Telesis.

C.   Alternatively, after the trial or evidentiary hearing, for a final judgment granting permanent injunctive relief enjoining the Toha from entering into or finalizing any existing agreement for the purchase of Voip.com or any or all of it asset and further enjoining Toha, individually, directly or indirectly through third parties, nominees or agents, from entering into negotiations for the sale of Voip.com or any or all of it's assets to Elevate until after January 29, 2010, which is one year after the Elevate terminated the LOI of December 18, 2008 with IP Telesis as expressly contemplate under Paragraph 12 of the LOI December 18, 2008.

D.   For such money damages that have been incurred and may be incurred by IP Telesis in the future as a result of the wrongful conduct of Toha as alleged herein, to include an award of the attorney fees and cost incurred by IP Telesis in prosecuting this action.

E.   For punitive damages in the amount of 5 million.

F.      For such other relief as the Court deems just and proper under the

circumstance and under the facts presented during the course of this proceeding and upon

the trial of the matter.

DATED this _6ᵗʰ_ day of July, 2009.

BLACK & ARGYLE, P.C.

David O. Black

From:Ledgestone Group     512 990 5215     10/30/ ˜B 04:58     #307 P.001/002

Exhibit "B"
1/2

# MUTUAL NON-DISCLOSURE AGREEMENT

This Mutual Non-Disclosure Agreement ("NDA") is effective as of the date set forth below between IP Telesis, Inc., a Nevada corporation, with offices at 4548 South Atherton Dr. #230, Salt Lake City, UT 84123("IP Telesis"), and the party identified below in the signature block.

For good and valuable consideration, the sufficiency of which is hereby acknowledged, the parties agree to the following.

1.     **Exchange of Confidential Information.** The parties desire to exchange confidential information necessary to consider transacting business and/or forming a business relationship ("Business Relationship") and one party (the "Discloser") may convey information to the other (the "Recipient") that it deems confidential.

2.     **Non-Disclosure and Non-Use of Confidential Information.** All Confidential Information, defined below, will be kept confidential by the Recipient and will not be disclosed, furnished, transferred, displayed or otherwise used, directly or indirectly, for any purpose other than the Authorized Use, defined below. A Recipient shall protect the Discloser's Confidential Information by using at least the same degree of care, but no less than reasonable care, to prevent the unauthorized use or disclosure of the Confidential Information as the Recipient uses to protect its own Confidential Information of like nature. Upon the Discloser's written request, the Recipient will promptly return to the Discloser or destroy (as requested) all copies (including, as commercially practical, electronic copies) of any Confidential Information held by the Recipient and its Representatives and any notes, analyses or other documents based on or incorporating any Confidential Information, except that the Recipient shall be entitled to retain one paper copy in its legal files subject to the provisions hereof.

3.     **"Confidential Information"** means any non-public information or data of a party, that is either specifically marked as confidential or proprietary by the Discloser at the time of disclosure or, if disclosed orally, shall be orally designated as confidential or proprietary, and thereafter identified as confidential by written or electronic advisory to the Recipient not later than thirty days following oral disclosure. The protections of this NDA will apply retroactively to the date of the oral disclosure, if the proper advisory of confidentiality is followed. Confidential Information also means the following, which are hereby deemed confidential without need for further marking or identification: the Discloser's pricing, customer lists, and methods and procedures for conducting business. Finally, Confidential Information includes trade secrets that Discloser may reveal to Recipient, in which case Discloser shall identify the information as confidential and proprietary trade secrets in writing to the Recipient.

4.     **Exclusions.** Confidential Information shall not include information that (i) is in or enters the public domain without breach of this NDA; (ii) was within the legitimate possession of the Recipient without restriction, and without notice of any restriction against its further disclosure; (iii) the Recipient can demonstrate was developed by the Recipient independently and without use of or reference to the Discloser's Confidential Information; or (iv) is disclosed with the prior written consent of the Discloser. If a party is directed to disclose Confidential Information by law enforcement, court order, or a government agency ("Law"), such disclosure shall not be deemed to be a breach of this NDA, provided the Recipient provides timely prior written notice of such requirement to the Discloser, to the extent reasonably practicable or allowed by Law, and reasonably cooperates with the Discloser's efforts to contest the scope of the required disclosure.

5.     **Term and Duration of Obligations.** This NDA shall continue in effect for a period of 2 years following the Effective Date, unless earlier terminated by either party by giving thirty days' written notice to the other party of its intent to terminate this NDA, unless another agreement between the parties provides differently. The obligations set forth in this NDA shall survive termination or expiration and extend for two years following the expiration or termination of this NDA, except as to any disclosed trade secrets which shall be maintained as confidential indefinitely.

6.     **Authorized Use.** Confidential Information is disclosed between the parties solely for the purpose of evaluating the information in connection with the parties' discussions concerning a possible Business Relationship. No license or other rights to the Confidential Information are hereby granted or intended. A Recipient shall use the Confidential Information only for discussion among its "Representatives," which means, with respect to either party, the officers, directors, employees, shareholders, investors, financial and legal advisers, and agents of such party who have a need to examine or review the Confidential Information of the Discloser and who are bound by nondisclosure obligations at least equivalent to the obligations imposed on the Recipient herein. The Recipient shall not, and shall not enable or allow any third party to, reverse-engineer, decompile, or disassemble any software disclosed by the Discloser and shall not remove or deface any notice of copyright, trademark, logo, legend, or other notices of ownership from any originals or copies of Confidential

-1-

Exhibit "B"
2/2

Information it obtains from the Discloser.

6.      **Ownership of Confidential Information.** The Discloser retains all right, title and interest in all Confidential Information it discloses and all improvements and modifications made thereto.

7.      **Miscellaneous.**

(a)      The parties acknowledge that monetary damages would not be sufficient remedy for any breach of this NDA and that the Discloser shall be entitled to seek equitable relief, including without limitation, the issuance of temporary and permanent injunctive relief, with bond hereby waived, against the Recipient as a remedy for any breach. Remedies in equity and/or in law may be sought for any breach of this NDA.

(b)      Each party bears its own costs for its obligations under this NDA. No partnership or joint venture is intended or formed by this NDA. Nothing in this NDA (i) obligates either party to enter into any agreement related to the Business Relationship, or (ii) extends to any third-party beneficiaries.

(c)      In any legal action necessary to enforce or interpret this NDA, the prevailing party shall recover all costs, expenses and reasonable attorney's fees.

(d)      This NDA contains the entire understanding of the parties regarding the subject matter described herein, except to the extent confidentiality provisions are included in any definitive agreement regarding the Business Relationship entered into by the parties, which shall be interpreted to be compatible with the terms herein. All additions or modifications to this NDA must be made in writing, signed by an authorized representative of each party. If any provision of this NDA is held unenforceable, such determination will not affect the remaining portions of this NDA, and the affected provisions shall be interpreted and enforced to the full extent possible to carry out the intent of such provision.

(e)      This NDA is governed, interpreted, and enforced in accordance with the laws of the State of Utah without regard to its conflicts of law provisions. Each party submits to the exercise of personal jurisdiction by the state and federal courts located within the State of Utah, for all purposes relating to this NDA.

(f)      Notices sent under this NDA shall be in writing, directed to the title and address appearing at the beginning or end of this NDA, or as later amended in writing, and shall be deemed to have been received as follows: (a) when delivered, if delivered in person; (b) one day after mailing, if sent by overnight courier; and (c) three business days after mailing, if sent by first class mail postage prepaid.

(g)      This NDA may be executed in one or more counterparts, including facsimile or scanned transmissions, each of which shall be deemed an original, all of which together shall constitute one and the same agreement.

Agreed to by authorized representatives of each party, effective the date last signed by a party ("Effective Date").

IP Telesis, Inc.                                    Customer: Elevate Communications LLC.

                                                    a _____ corp./LLC/person/other entity

By (Signature)                                      By (Signature)

GREG NIELSEN                                        ____ Thurston
Print Name                                          Print Name

PRESIDENT                                           CEO
Title                                               Title

Date: 10-30-08                                      Date: 10-30-08

                                                    Address: _____

                                                    _____

                                                    _____

-2-

December 18, 2008

**Personal and Confidential**

IP Telesis, Inc.
Attn: Greg Nielsen, President
Attn: Brian Pettersen, Chairman
4548 S. Atherton Dr., Suite 230
Salt Lake City, Utah 84123

> Re: Proposed Acquisition of Assets of IP Telesis, Inc. by Elevate Communications, LLC

Dear Greg and Brian:

This letter of intent (this "Letter") confirms our understanding of the mutual present intentions of Elevate Communications, LLC, a Utah limited liability company (the "Purchaser") and IP Telesis, Inc. (the "Company") with respect to the principal terms and conditions under which the Purchaser will acquire various assets of the Company. Such transaction is hereinafter referred to as the "Acquisition."

The obligations of the parties hereto to consummate the Acquisition are subject to the negotiation and execution of the Purchase Agreement referred to in paragraph 3 below. Accordingly, this Letter is intended solely as a basis for further discussion and is not intended to be and does not constitute a legally binding agreement; provided, however, that the provisions set forth in paragraphs 7, 8, 9, 11, 12, 13, 14 and 15 below and this paragraph shall be binding upon the parties hereto and, only with respect to paragraphs 7(b), 7(c), 7(d), 11, 12, and 14, shall survive the termination hereof. This Letter shall not confer on any person or entity, other than the parties hereto, any rights or remedies.

1.     Purchase of Assets.

(a) On the terms and subject to the conditions to be set forth in a definitive, legally binding, written asset purchase agreement to be negotiated and executed by the parties hereto (the "Purchase Agreement"), the Purchaser will purchase substantially all of the assets, tangible or intangible of the Company (collectively, the "Assets"). Except for assumed liabilities as set forth in Paragraph 1(b) below, the Assets will be transferred to Purchaser free and clear of any lien, changes, restrictions, encumbrances or rights of third parties whatsoever.

275111.5

The Assets will be acquired for the consideration set forth in Section 2 of this Letter at the closing date (the "Closing") specified in the Purchase Agreement.

(b) The Purchaser shall assume only the liabilities incurred in the normal course of the business of the Company and reasonably related to the Assets, including, but not limited to, the broadsoft switch. The Purchase Agreement shall include detailed provisions relating to those obligations being assumed and the use of cash by the Company prior to Closing.

(c) As a condition of the Purchaser's obligation to purchase the Assets, Greg Nielsen will enter into a three-year employment agreement with the Purchaser, which agreement shall include, among other things, a prohibition against competition with the Purchaser, all on mutually acceptable terms and conditions.

(d) It is anticipated that any federal or state taxes relating to the sale of the Assets by the Company will be offset by the Company's net operating loss carry forward. In the event that the parties reasonably determine that the transaction as proposed to be structured would result in tax liability to the Company in excess of the Company's net operating loss carry forward, the parties will negotiate in good faith to structure the terms of the Purchase Agreement so as to minimize any tax liability to the Company to the maximum extent allowable by applicable state and federal law and so long as such restructuring does not result in an increase in the purchase price or tax liability of the Purchaser.

2. Purchase Price. The purchase price for the Assets will consist of $1,875,000.00 cash. The purchase price will be payable as follows: (a) $100,000.00 due and payable upon execution of this Letter (the "Initial Payment"); (b) $750,000.00 due upon the execution of the Purchase Agreement LESS the amount of the Initial Payment; and (c) $1,125,000.00 due on or before the twelve-month anniversary of the execution date of the Purchase Agreement (the "Final Payment"). The Final Payment shall be evidenced by a promissory note bearing interest at the applicable federal rate per annum and shall be secured by the Assets and containing such other terms as agreed upon by the parties and as will be set forth in the Purchase Agreement.

As additional consideration for the purchase of the Assets, the Purchaser shall pay to the Company (or to a limited liability company or liquidating trust designated by the Company) on a quarterly basis an amount equal to 50% of the net profit before taxes received by the Company from that certain contract with Touchfon Int'l Inc. (the "Touchfon Contract") for the initial term of the Touchfon Contract, which contract shall expressly be included among the Assets and transferred to the Company pursuant to the Purchase Agreement. The payment amount derived from the Touchfon Contract shall be payable only on the realization by the Company of net profits from such Touchfon Contract and such other terms and conditions to be more specifically set forth in the Purchase Agreement. The Company shall distribute any amounts received pursuant to this provision to all of the Company's then existing shareholders on a pro rata basis or as otherwise agreed to by the parties hereto on the terms and conditions set forth in the Purchase Agreement or any ancillary documents thereto.

Exhibit A

2/9

3.     <u>Definitive Agreement</u>.  The Purchaser and the Company hereby agree to use reasonable diligence to commence good faith negotiations in order to execute and deliver the Purchase Agreement acceptable to parties hereto within 30 days of Company's acceptance of this Letter.  All terms and conditions concerning the Acquisition shall be stated in the Purchase Agreement (or agreements to be entered into pursuant to the Purchase Agreement), including without limitation, representations, warranties, covenants, holdback provisions and indemnities that are usual and customary in a transaction of this nature as such may be mutually agreed upon between the parties.  Counsel for the Purchaser shall prepare the initial draft of the Purchase Agreement.

4.     <u>Representations and Warranties</u>.  The Purchase Agreement will contain representations and warranties customary to transactions of this type, including without limitation, representations and warranties by the Company as to (a) the accuracy and completeness of the Company's financial statements for the past three years and current financial statements; (b) disclosure of all the Company's contracts, commitments and liabilities, direct or contingent; (c) the physical condition, suitability, ownership and absence of liens, claims and other adverse interests, with respect to the Assets; (d) the absence of liabilities with respect to the Company, other than as set forth in the balance sheet dated as of the last completed fiscal quarter of the Company, and liabilities incurred in the ordinary course of business since that date; (e) the absence of a material adverse change in the condition (financial or otherwise), business, properties, assets or prospects of the Company; (f) the absence of pending or threatened litigation, claims, investigations or other matters affecting the Acquisition; (g) the Company's compliance with laws and regulations applicable to its business and obtaining all licenses and permits required for its business; and (h) the due incorporation, organization, valid existence, good standing and capitalization of the Company.

5.     <u>Conditions to Consummation of the Acquisition</u>.  The obligation of the Purchaser with respect to the Acquisition shall be subject to satisfaction of conditions customary to transactions of this type, including without limitation, (a) receipt and approval by the Purchaser of the Company's last year end financial statements and current financial statements; (b) execution of the Purchase Agreement by all parties; (c) the obtaining of all requisite regulatory, administrative, governmental or third party authorizations and consents; (d) absence of a material adverse change in the condition (financial or otherwise), business, properties, assets or prospects of the Company; (e) absence of pending or threatened litigation, claims, investigations or other matters affecting the Company or the Acquisition; (f) delivery of customary legal opinions, closing certificates and other closing documentation; (g) satisfactory completion by the Purchaser of a due diligence investigation of the Company and the Assets; (h) confirmation that the representations and warranties of the Company are true and accurate in all respects; (i) the execution of noncompetition agreements in form satisfactory to both parties between the Purchaser and the Company, the Company's key employees, key shareholders, officers, and directors; and (j) such other conditions as are customary for commercial acquisition transactions of a similar nature.

Exhibit A
3/9

6. <u>Mutual Indemnification</u>.   The accuracy of each of the parties' representations and warranties made in the Purchase Agreement and the performance of all covenants and other obligations according to the terms of the Purchase Agreement will be secured by, and breaches with respect thereto shall be payable to the other party in accordance with terms set forth in, the Purchase Agreement.

7. <u>Covenants of the Company</u>.

(a) The Company covenants and agrees that it shall place the Initial Payment in escrow with the Company's legal counsel with instructions to hold the Initial Payment pending Closing and successful completion of the transactions contemplated hereby.

(b) If the Acquisition does not close and the parties fail to execute and deliver a Purchase Agreement satisfactory to both parties within 30 days following the Company's acceptance of this Letter, the Purchaser shall have the option to either (i) have the Initial Payment applied as a credit on the Purchaser's account with the Company in relation to the provision of services under the existing Services Contract between the parties (the "Services Contract"), or (ii) to require a return of the Initial Payment. If the Purchaser shall not have provided written notice to the Company under this Section 7(b) at the end of the 30-day period following acceptance of this Letter, the Purchaser shall be deemed to have selected the option of having the Initial Payment applied as credit on the Purchaser's account with the Company under the Services Contract.

(c) The Company covenants and agrees that this Letter may be cancelled or terminated only by the Purchaser during the 30-day period following the Company's acceptance of this Letter. If the Initial Payment shall have been credited to the Purchaser's account with the Company under the terms of this Letter, the Company further covenants and agrees that it shall not have power to terminate the Services Agreement until the Initial Payment amount has been fully applied to the Purchaser's account with the Company and the Company has provided services to the Purchaser in full satisfaction of such Initial Payment amount.

(d) The Company covenants and agrees that, if the parties hereto fail to execute and deliver a Purchase Agreement satisfactory to both parties prior to the expiration of the 30-day period following the Company's acceptance of this Letter, in addition to any other rights granted under the Services Contract, the Purchaser shall have the exclusive option to either renegotiate the terms of the Services Agreement or to terminate the Services Agreement at any time during the term thereof upon 30 days written notice.

(e) The Company covenants and agrees that, at Closing and if the Purchaser so requests, the Company will terminate any agreement it may have, in any form whatsoever, to acquire the company commonly referred to as "Voip.com" or any affiliated companies thereof, whether through asset purchase, equity acquisition, or otherwise. The Company covenants and agrees that during the term of this Letter, it will not enter into or continue any negotiations or agreement to acquire Voip.com.

Exhibit A
41 9

(f)     The Company covenants and agrees that following the execution of this Letter and until Closing the Company shall take reasonable business efforts to manage its cash, receivables and payables so as to maximize the value of the Assets being transferred to the Purchaser at Closing and only incur indebtedness or other monetary obligations to the extent necessary to maintain the business of the Company in good standing with its customers and suppliers. It is the intent of the parties that prior to Closing the Company will use cash solely for the purpose of meeting the Company's ordinary business expenses as reflected in the income statements provided to the Purchaser prior to the date hereof and that the Company will not incur any other payables or indebtedness, or use cash for any reason not authorized herein, without the prior written consent of the Purchaser.

8.     <u>Access to Records</u>. Commencing on the date this Letter is signed, the Company will give the Purchaser and its representatives full access to any personnel and all properties, documents, contracts, books, records and operations of the Assets and the Company relating to its business. The Company will furnish the Purchaser with copies of documents and with such other information as the Purchaser may request. Upon request of the Company during the term of this Letter, Purchaser shall provide reasonable historical financial statements and information and pro forma financial information through 2010 demonstrating its ability to make the Final Payment.

9.     <u>No Other Offers</u>. The Company acknowledges that the Purchaser will incur significant expense in connection with its due diligence review and preparation and negotiation of the Purchase Agreement. As a result, upon execution of this Letter the Company shall terminate any existing discussions or negotiations with, and shall cease to provide information to or otherwise cooperate with, any party other than the Purchaser and its representatives with respect to an Acquisition Transaction (as defined below). In addition, from and after the date hereof, none of the Company nor any of its shareholders, subsidiaries or affiliates, or any of their respective officers, directors, employees, members, managers, representatives or agents, will directly or indirectly encourage, solicit, initiate, have or continue any discussions or negotiations with or participate in any discussions or negotiations with or provide any information to or otherwise cooperate in any other way with, or enter into any agreement, letter of intent or agreement in principle with, or facilitate or encourage any effort or attempt by any corporation, partnership, company, person or other entity or group (other than the Purchaser and its shareholders, subsidiaries or affiliates, or any of their respective officers, directors, employees, members, managers, representatives or agents) concerning any merger, joint venture, recapitalization, reorganization, sale of substantial assets, sale of any shares of capital stock, investment or similar transaction involving the Company or any subsidiary or division of the Company (each, an "<u>Acquisition Transaction</u>"). The Company shall notify the Purchaser promptly of any inquiries, proposals or offers made by third parties to the Company or any of its shareholders, subsidiaries or affiliates, or any of their respective officers, directors, employees, members, managers, representatives or agents with respect to an Acquisition Transaction and furnish the Purchaser the terms thereof (including, without limitation, the type of consideration offered and the identity of the third party). The Company shall deal exclusively with the Purchaser with respect to any possible Acquisition Transaction and the Purchaser shall

Exhibit A
5/9

have the right to match the terms of any proposed transactions in lieu of such parties. The provisions of this Section 9 shall only apply during the term of this Letter.

10.    Conduct of Business. The Company shall use its reasonable best efforts to preserve intact the business organization and employees and other business relationships of the Company; shall continue to operate in the ordinary course of business and maintain its books, records and accounts in accordance with generally accepted accounting principles, consistent with past practice; shall use its reasonable best efforts to maintain the Company's current financial condition, including working capital levels; shall not incur any indebtedness or enter into any agreements to make business or product line acquisitions; shall not sell or contract to sell any of its assets except in the ordinary course of business; shall not lease, license, transfer, pledge, mortgage, hypothecate or otherwise dispose of any of the Assets; and shall not enter into any transaction outside the ordinary course of business.

11.    Expenses. Each of the parties shall pay all of its expenses incident to this Letter, the Purchase Agreement and consummation of the transactions contemplated hereby and thereby. The Company represents and warrants that there are no brokerage or finder's fees which are or will be payable in connection with the Acquisition.

12.    Confidentiality. Each of the Company and the Purchaser agree that each of them shall at all times take all reasonably necessary steps to safeguard the confidentiality of proprietary information of the other party disclosed by or on behalf of that party in connection with the Acquisition, that such information will be used solely for the purpose of evaluating the Acquisition, and that such information will not be disclosed to any third party without the prior written consent of the other party; provided, however, that the Company and the Purchaser may disclose:

(a)    Information which at the time of the disclosure is part of the public knowledge and readily accessible to such third party; and

(b)    Information that is required by law to be disclosed.

The Company and the Purchaser further agree that if the Acquisition is not consummated, each of them will return to the other party any and all material containing or reflecting such information.

The Company understands and agrees that the Purchaser will be negotiating regarding the acquisition of Voip.com concurrently with its undertaking to complete the Purchase Agreement and Closing. Subject to any limitations contained in this Section 12, any information that the Purchaser has previously acquired or will acquire with respect to Voip.com and any relationship or agreement the Company may have with Voip.com may be used by the Purchaser during the term hereof solely in connection with the Purchaser's negotiations with Voip.com.

The Purchaser acknowledges that the Company has a preexisting business relationship with Voip.com. The parties hereto acknowledge and agree that any existing agreement between the

Exhibit A
⁴/9

Company and Voip.com shall be included in the Assets to be transferred to the Purchaser upon Closing and that during the term hereof the Company shall cease any and all negotiations regarding the acquisition of Voip.com. The Company agrees that if, but only if, the parties hereto do not enter into the Purchase Agreement, the Company may enter into negotiations to acquire Voip.com. The Purchaser shall not close or complete any agreement with Voip.com until the closing of the Purchase Agreement, except for a non-binding letter of intent to acquire Voip.com. If for any reason the Purchase Agreement does not close, the Purchaser agrees that it shall terminate any negotiations, agreements or arrangements to acquire an ownership interest in Voip.com and so long as the Company is in active negotiations with or has a contract with Voip.com to acquire an ownership interest in Voip.com, the Purchaser shall not initiate negotiations to enter into an agreement or arrangement with Voip.com to acquire an ownership interest in Voip.com for a period of one year thereafter, without the prior written consent of the Company.

13.  Disclosure.  Without the prior written consent of the Purchaser, the Company will not, and each party hereto will cause its directors, officers, shareholders, employees, agents, other representatives and affiliates not to, disclose to any person the fact that discussions or negotiations are taking place concerning the transactions contemplated hereby, the status thereof, or the existence of this Letter and the terms thereof, unless in the opinion of such party disclosure is required to be made by applicable law, regulation or court order, and such disclosure is made after prior consultation with the Purchaser.

14.  Termination.  Prior to the expiration of the 30-day period following the Company's acceptance of this Letter, only the Purchaser may terminate this Letter for any reason at any time and, upon such termination, the parties shall be released from all liabilities and obligations with respect to the subject matter hereof, except as provided in the second paragraph of page 1 of this Letter. If, on the expiration of the 30-day period following the Company's acceptance of this Letter, the parties have not executed and delivered a Purchase Agreement satisfactory to both parties, either party may terminate this Letter and, upon such termination, the parties shall be released from all liabilities and obligations with respect to the subject matter hereof, except as provided in the second paragraph of page 1 of this Letter.

15.  Right to Complete Due Diligence and Acquisition.  For valuable consideration, the receipt of which is hereby acknowledged, the Company agrees that the Purchaser shall have the right to complete its due diligence on the Company, its Assets, the Company's supplier and vendor relationships, and to consummate the Acquisition on the terms outlined herein, and the Company and the Purchaser agree to cooperate fully and in good faith to complete the transaction as expeditiously as possible after the Purchaser has confirmed its due diligence investigation to its satisfaction. The Company acknowledged that such activities by the Purchaser may include negotiations with Voip.com and authorizes the Purchaser to conduct such negotiations.

16.  Counterparts.  This Letter may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

Exhibit A
7 / 9

        If the foregoing correctly sets forth our mutual understanding, please so indicate by signing two copies of this Letter in the spaces provided below and returning one copy to us no later than 5:00 p.m. on December 19, 2008.  This Letter will expire if you have not returned to us an executed copy of this Letter by said time.


Very truly yours,

Elevate Communications, LLC

By: _____
Title: _____

Accepted and agreed

IP Telesis, Inc.

By: _____
Title: _____

Exhibit A
9/9